# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50320 | **DATE** | 8/6/2004 |
| **CASE TITLE** | | Thulen vs. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process. Plaintiff's Motion for Judgment on the Administrative Record and Pleadings is denied; Defendant's Motion for Summary Judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | 8-9-04 | | 18 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 8/6/2004 | | |
| | | | date mailed notice | | |
| sp | courtroom deputy's initials | | | sp mailing deputy initials | |

U.S. DISTRICT COURT

2004 AUG -6 PM 3:5?

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| PAUL W. THULEN, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 03 C 50320 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Paul W. Thulen ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1381(a). This matter is before the Magistrate Judge pursuant to consents filed by Plaintiff and Commissioner on December 3, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff filed for DIB on September 5, 1997, alleging disability on April 12, 1997. (Tr. 135). Plaintiff's application for benefits was denied on January 12, 1998. (Tr. 86). Plaintiff filed a request for reconsideration on January 29, 1998. (Tr. 90). Plaintiff's request for reconsideration was denied on March 13, 1998. (Tr. 91). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on May 13, 1998. (Tr. 94). Plaintiff

appeared, with counsel, before an ALJ on March 15, 2001. (Tr. 38). In a decision dated April 25, 2001, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 26-33). On May 9, 2001, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 13). On June 17, 2001, the Appeals Council denied Plaintiff's request for review. (Tr. 9).

## II. FACTS

Plaintiff was born on December 3, 1961, and was thirty-nine years old at the time of his March 15, 2001, hearing before the ALJ. (Tr. 135). Plaintiff graduated from high school. (Tr. 43). At the time of the hearing, Plaintiff testified that he lived in a house with his mother and three older siblings. (Tr. 42). Plaintiff had a heart attack some time around April 12, 1997, and suffers from coronary artery disease, high blood pressure, shortness of breath, diabetes, and obesity. For these reasons, and some others, Plaintiff claims to be disabled.

At the time of his hearing, Plaintiff's most recent – and only – employment was with the Village of Savanna, Illinois. (Tr. 58). Plaintiff testified that he worked 18 years for the Village of Savanna as a "jack-of-all-trades" who would pick up garbage, fix water leaks and sewers, and maintain walkways and roadways.[1] (Tr. 58-59). This job was full-time. (Tr. 43). While employed by the Village of Savanna, Plaintiff testified that the most he had to lift was "a couple of hundred pounds" and that he would frequently lift between 50 and 100 pounds. (Tr. 59).

Plaintiff ended his full-time employment with the Village of Savanna after his heart attack in April of 1997. (Tr. 43). Plaintiff testified that he could not continue with his line of

---

[1] An Attachment to Plaintiff's Vocational Report dated 09-22-97 reveals that Plaintiff officially worked as a "Public Works Maintenance Worker - 3." (Tr. 170). It is unclear how often Plaintiff performed his duties standing or sitting.

2

work because of feeling tired, fatigued, and not having "the wind for it." (*Id.*) Plaintiff likewise did not pursue lighter jobs because of feeling "tired all the time" in addition to experiencing a painful back and not knowing how he will feel from day to day. (Tr. 44).

On a typical day, Plaintiff testified that he sleeps and watches TV at two hour intervals. (Tr. 54). Plaintiff stated that he may make breakfast for himself "once in a while." (*Id.*) Plaintiff testified that he does not clean, dust, vacuum, do dishes or wash laundry for himself – his 81-year-old mother does the laundry, and someone else does the cleaning.[2] (Tr. 55). Plaintiff testified that he is able to make his own bed, change his sheets, and bathe and dress himself. (*Id.*). Despite his frequent, daily naps, Plaintiff told the ALJ that he always feels tired. (Tr. 61). Plaintiff does not make trips to the grocery store; he has someone else deliver his groceries. (Tr. 55). Plaintiff does not do any yard work including mowing the lawn, raking leaves, or shoveling snow – his younger brother takes care of these tasks. (Tr. 55-56). Plaintiff testified that he does, however, take small walks of up to 100 yards roughly every other day. (Tr. 56). Plaintiff also testified that he is able to change light bulbs or change batteries in a smoke detector when needed. (Tr. 58).

Plaintiff does not have any hobbies, does not go out to eat or to see movies, does not attend religious services, has not been out of town for vacation or other reasons (for three years prior to his hearing), and does not participate in social, church, or volunteer activities. (Tr. 56-57). Plaintiff still has a valid driver's license without any restrictions, and testified that he drives two to three times per week through town or to see the Mississippi River, which is just a two to three minute drive from Plaintiff's home. (Tr. 43). With regard to family interactions, Plaintiff

---

[2] It is not clear from the record who this "someone else" is.

testified that he talks to his mother but interacts with his older siblings as minimally as possible because they are mentally handicapped and he prefers to "avoid it." (Tr. 57-58).

At the hearing, Plaintiff's mother testified on his behalf. (Tr. 71). She stated that Plaintiff has "a lot of problems" including his breathing and his high level of stress due to living with his older siblings. (Tr. 72). She testified that Plaintiff sometimes gets up during the day and makes himself some eggs before "just [sitting] in his chair" because "that's about all he's able to do." (Tr. 73). She added, however, that Plaintiff is able to drive himself to the doctor because "the doctor is just uptown." (*Id.*).

Vocational Expert, James Radke, also appeared before the ALJ during Plaintiff's hearing on March 15, 2001. (Tr. 73). The vocational expert testified that Plaintiff's position with the Village of Savanna would be classified as "heavy in terms of exertion and semi-skilled in terms of his [skill] level." (Tr. 74).

The ALJ then presented the vocational expert with the following hypothetical situation:

> If I would assume, on the basis of the record, an individual who is 39-years-old has the work experience and education of this claimant and has the following exertional limitations: can sit for six hours, stand and walk for six hours, can lift and carry frequently up to 25 pounds, occasionally up to 50 pounds, and only can occasionally stoop, crawl, and climb stairs and ramps, can never climb any ladders, robes or scaffolds. Can only occasionally crouch, kneel or balance. Further assuming someone who must avoid concentrated exposure to activities involving unprotected heights, being around moving and hazardous machinery, and dust odors, fumes and gases. [I should] assume such a person could not perform the claimant's past work, is that correct?

(Tr. 74-75). The vocational expert stated that such a hypothetical person could perform Plaintiff's past work as a truck driver,[3] and could also perform work as a janitor, cleaner, food

---

[3] The vocational expert specifically stated that "as part of [Plaintiff's] work history he did drive a truck and what you're describing does fit within the description of truck driving." (Tr. 75).

preparation worker, and medium level packager or filler. (Tr. 75). The ALJ then added that the hypothetical person should "avoid concentrated exposure to temperature extremes. (Tr. 75). This modification did not change the vocational expert's answer about what work the hypothetical person could perform. (*Id.*). The ALJ further modified the hypothetical by changing the exertional requirement to "light work, someone who can lift and carry frequently just up to 10 pounds and occasionally up to 20 pounds." (Tr. 75-76). With these modifications, the vocational expert opined that Plaintiff's past work as a truck driver would be eliminated, but such a hypothetical person could still perform packaging and filling positions, work in miscellaneous food prep positions, or work as a cashier or assembler. (Tr. 76). The ALJ proceeded to modify the hypothetical further by adding the requirement that the hypothetical person be allowed to sit and stand approximately every 45 minutes. (*Id.*). With this change, the vocational expert stated that a hypothetical person with these limitations could still work in some packaging, filling, miscellaneous food preparation, and cashier positions. (*Id.*). The vocational expert also determined that the individual would be able to work in sedentary assembly and sorting occupations. (*Id.*). According to the vocational expert, at the time of the hearing, there were less than 1,000 packaging and filling positions, about 7,000 miscellaneous food preparation positions, and 24,300 cashier positions in the Northern Illinois area that such a hypothetical person could perform. (Tr. 76).

## III. **MEDICAL HISTORY**

On April 13, 1997, Plaintiff was taken to the Emergency Department of the Samaritan Health System in Clinton, Iowa, via ambulance. (Tr. 228). Plaintiff had been coughing up blood for a couple of days before seeking treatment, and started experiencing severe left back and rib

pain which worsened with breathing and coughing. (*Id.*) The History and Physical Report, by J. Gondwe, M.D., noted that Plaintiff "[smoked] quite a bit and apparently [had] been drinking quite a bit lately." (Tr. 230). Dr. Gondwe's physical exam indicated Plaintiff had a "density in the left breast, maybe pneumonia." (*Id.*). Dr. Gondwe's impression of Plaintiff at that time indicated that Plaintiff suffered from pleurisy,[4] had an abnormal electrocardiogram[5] suggesting a myocardial infarction, was obese, and had problems with nicotine addiction and alcoholism. (*Id.*). Plaintiff was treated with penicillin and heparin, and laboratory tests were ordered. (*Id.*).

Plaintiff was admitted to the Samaritan Health System, and underwent further testing and consultation examinations. (Tr. 226-268). At the time of a consultative examination by Q. Rasheed, M.D., F.A.C.C., also on April 13, 1997, Plaintiff was alert and oriented, and appeared in mild respiratory distress. (Tr. 232). Dr. Rasheed determined that Plaintiff experienced an acute pulmonary embolism,[6] had an abnormal electrocardiogram with evidence of inferior[7] and anterolateral[8] myocardial infarction, used tobacco, and used alcohol with probable dependence. (*Id.*). With regard to Plaintiff's tobacco use, Dr. Rasheed noted that Plaintiff smoked two packs of cigarettes per day for fifteen years. (*Id.*). Dr. Rasheed agreed with Dr. Gondwe's decision to

---

[4] Inflammation of the serous membrane enveloping the lungs and lining of the walls of the pleural cavity. STEDMAN'S MEDICAL DICTIONARY 1382 (26th ed. 1995).

[5] Graphic record of the heart's integrated action currents obtained with the electrocardiograph. STEDMAN'S MEDICAL DICTIONARY 550 (26th ed. 1995).

[6] Obstruction or occlusion of a pulmonary vessel by an embolus. STEDMAN'S MEDICAL DICTIONARY 558 (26th ed. 1995).

[7] Situated below or directed downward. STEDMAN'S MEDICAL DICTIONARY 869 (26th ed. 1995).

[8] In front and away from the middle line. STEDMAN'S MEDICAL DICTIONARY 97 (26th ed. 1995).

heparinize[9] Plaintiff, and ordered further tests to assess Plaintiff's cardiac functioning. (*Id.*). Dr. Rasheed noted that Plaintiff was "critical at [that] time and without treatment the potential for morbidity and mortality [was] high." (*Id.*).

On April 14, 1997, during Plaintiff's hospitalization, he underwent a consultative examination by Nidal Harb, M.D., who was asked to assume Plaintiff's cardiac care. (Tr. 234). At the beginning of the consultation notes, Dr. Harb stated that "the patient is a poor historian and has been somewhat noncompliant with doctor's visits." (*Id.*). Dr. Harb indicated that Plaintiff's cardiac risk factors included obesity, hypertension,[10] his gender, hypercholesterolemia,[11] family history for coronary artery disease, and smoking. (*Id.*). Dr. Harb also indicated that Plaintiff denied affliction with diabetes mellitus. (*Id.*). Dr. Harb's impression of Plaintiff was similar to the impressions of Drs. Gondwe and Rasheed; Dr. Harb noted that Plaintiff had a pulmonary embolus, suffered from coronary artery disease, was morbidly obese, had hyperlipedemia,[12] and was addicted to nicotine. (*Id.*). Dr. Harb recommended that Plaintiff continue with heparin treatment until switching later to warfarin therapy, and that Plaintiff use topical nitrates if his condition permitted. (*Id.*). Dr. Harb also discussed with Plaintiff the need to modify Plaintiff's cardiac risk factors, the nature of coronary artery disease, and the possible modalities of treatment. (*Id.*).

---

[9] To perform therapeutic administration of heparin. STEDMAN'S MEDICAL DICTIONARY 784 (26th ed. 1995).

[10] High blood pressure. STEDMAN'S MEDICAL DICTIONARY 831 (26th ed. 1995).

[11] The presence of an abnormally large amount of cholesterol in the cells and plasma of the circulating blood. STEDMAN'S MEDICAL DICTIONARY 823 (26th ed. 1995).

[12] The presence of an abnormally large amount of lipids in the circulating blood. STEDMAN'S MEDICAL DICTIONARY 985 (26th ed. 1995).

Plaintiff remained hospitalized through April 21, 1997, when he was discharged to home. (Tr. 226). Dr. Gondwe's discharge summary of Plaintiff's hospitalization reported a final diagnosis of (1) pulmonary embolism, (2) deep venous thrombosis involving the left lower extremity, (3) pneumonia involving the left lower and right middle lobes of the lungs, (4) coronary vascular disease with a history of subacute myocardial infarction, (5) history of tobacco abuse, (6) obesity, and (7) pleurisy caused by a pulmonary embolus. (*Id.*). Dr. Gondwe commented that Plaintiff's chest x-rays showed improvement of the lung tissue, and that Plaintiff's echocardiogram was "technically a very difficult study with enlargement of the left ventricle." (*Id.*). Further, Dr. Gondwe stated that Plaintiff was not to work for two months after hospitalization, should try to quit smoking, and should follow-up with him and with Dr. Harb as scheduled. (*Id.*). Dr. Gondwe offered Plaintiff nicotine patches, but reported that Plaintiff had not committed himself to quitting smoking yet. (*Id.*). Dr. Gondwe documented his concern that Plaintiff could "force more damage to the heart" if he smoked while using nicotine patches. (*Id.*).

Plaintiff followed up with Dr. Harb on May 6, 1997. (Tr. 279). At that time, Plaintiff denied chest pain, shortness of breath, dizziness or loss of consciousness. (*Id.*). Plaintiff had dyspnea[13] on exertion and some palpitations,[14] but reported feeling "much better." (*Id.*). Dr. Harb noted that Plaintiff was "rather noncompliant" and continued to smoke very heavily. (*Id.*). Dr. Harb's examination of Plaintiff revealed a morbidly obese individual with stable vital signs,

---

[13] Shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart of lungs; occurs normally during intense physical exertion or at high altitude. STEDMAN'S MEDICAL DICTIONARY 535 (26th ed. 1995).

[14] Forcible or irregular pulsation of the heart, perceptible to the patient, usually with an increase in frequency of force, with or without irregularity in rhythm. STEDMAN'S MEDICAL DICTIONARY 1285 (26th ed. 1995).

clear lungs, a heart beating at a regular rate and rhythm, and no edema[15] in the extremities. (*Id.*).

Dr. Harb "strongly advised [Plaintiff] to stop smoking and modify other risk factors." (*Id.*).

On May 8, 1997, Plaintiff saw Dr. Harb for a second follow-up visit. (Tr. 278). According to Dr. Harb

> . . . [Plaintiff] presented after [medical staff] called him for follow-up and evaluation. [Staff called] the [Plaintiff in the] evening and during the night to have him follow-up . . . and [] were not able to get a hold of him until today.

(Tr. 278). Plaintiff's health status was relatively unchanged compared to his May 6, 1997 examination. (*Id.*). Dr. Harb again reported that Plaintiff continued to smoke heavily, in spite of being instructed to stop smoking and modify other risk factors. (*Id.*).

Handwritten medical records reveal that Plaintiff was seen on May 16, 1997. (Tr. 277). The assessment and plan from this appointment are largely illegible, and the signature of the treating practitioner cannot be deciphered. (*Id.*).

Plaintiff's next medical appointment was on May 19, 1997, with Dr. Harb. (Tr. 276). At that time, Dr.Harb dictated that Plaintiff was

> somewhat of a poor historian and difficult to assess. He appears to have some denial problems. He is asymptomatic at this time. The patient does feel better since he was started on [a beta-blocker].

(*Id.*). Because Plaintiff continued to smoke heavily, and because an electrophysiologist apparently documented certain findings which Dr. Harb wanted to follow-up on, Dr. Harb switched Plaintiff's anticoagulant medication, and advised cardiac catheterization for that day.[16]

(*Id.*). Plaintiff declined admission at that time, and arranged admission for cardiac

---

[15] An accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities. STEDMAN'S MEDICAL DICTIONARY 544 (26th ed. 1995).

[16] A record documenting examination or treatment by this electrophysiologist is not included in the medical record before this court.

9

catheterization at a later time. (*Id.*). Dr Harb again advised Plaintiff to stop smoking and modify his other risk factors. (*Id.*).

On May 20, 1997, Plaintiff was evaluated for admission to the Samaritan Health System for cardiac evaluation and management. (Tr. 293). At the time of Plaintiff's "History & Physical" examination by Dr. Harb, Plaintiff was asymptomatic and appeared to be in no acute distress. (*Id.*). Again, Dr. Harb noted that Plaintiff was difficult to assess because he provided a poor history of his situation and appeared to have denial problems. (*Id.*). Dr. Harb's discharge summary for this hospitalization reported the following final diagnoses:

> (1) Coronary artery disease. . . on the basis of his clinical presentation (at that time patient did not seek medical attention) with atypical angina which appears to be stable.
> (2) Pulmonary embolism per ventilation-perfusion lung scan in April 1997.
> (3) Morbid Obesity.
> (4) Hyperlipidemia.
> (5) Nicotine Addiction.
> (6) Accelerated intraventricular rhythm on Holter monitor which [has] now improved after treatment.
> (7) Latent congestive heart failure, ejection fraction estimated around 45%.

(Tr. 295). Dr. Harb's discussion notes state that Plaintiff "[had] only mild ischemia,[17] induced by exercise. His angina[18] is now rare, if any. He feels fine." (*Id.*). Dr. Harb also noted that

> Patient is completely asymptomatic now and hemodynamically stable. He has been up and around and anxious to go home. He will be discharged. . . . With his risk factors emphasized, he was advised strongly to stop smoking, to lose weight, etc. He will be discharged . . .

(Tr. 296).

_____

[17] Local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply. STEDMAN'S MEDICAL DICTIONARY 894 (26th ed. 1995).

[18] A sever, often constricting pain usually referring to a. pectoris. STEDMAN'S MEDICAL DICTIONARY 83 (26th ed. 1995).

10

On May 27, 1997, Plaintiff sought care at the Emergency Department of the Samaritan Health System at approximately 2:00 a.m., chiefly complaining of a sudden onset of chest pain and shortness of breath. (Tr. 305). Dr. Harb dictated Plaintiff's History & Physical for Plaintiff's hospitalization and again reported that Plaintiff "appear[ed] to be a somewhat poor historian and [his ex-wife] could not remember the details." (Tr. 306). Further, Dr. Harb indicated that Plaintiff was "on the boat" and "had a few beers." (*Id.*). By the time Dr. Harb examined Plaintiff, he denied palpitations, dizziness, and loss of consciousness. (*Id.*). Dr. Harb reported that Plaintiff was in no acute distress. (Tr. 307). Dr. Harb indicated that Plaintiff "did not [previously] take medication as instructed and actually did not even buy the prescription given to him. [Plaintiff] continues to smoke heavily although he was instructed not to do so especially when utilizing the Nicoderm patch."[19] (Tr. 306).

Plaintiff submitted to x-rays and electrocardiograms on May 27-29, 1997, at the Samaritan Health System. (Tr. 309-311, 313-315). The chest x-ray taken on May 27, 1997, was reported to be a normal exam. (Tr. 309). With regard to the x-rays taken on May 28, 1997, it was concluded that "the dorsal spine show[ed] some very mild degenerative changes; no other abnormalities [were] noted." (Tr. 313). The four electrocardiograms taken on May 27-29 were all "abnormal."[20] (Tr. 310, 311, 314, 315).

---

[19] It is unclear what Plaintiff's final diagnosis was or what the Impressions/Recommendations were for this hospitalization. A "Discharge Summary" which most likely pertains to this hospitalization may be found on page 312 of the record, but this report does not contain an admission or discharge date, and only "Page 1 of 2" of the two-page report is included in the record. This court, however, will not make assumptions about the contents of Plaintiff's medical record.

[20] While these tests are entitled "Abnormal ECGs," it is impossible for this court to determine what impressions or recommendations Plaintiff's treating practitioners gleaned from these test results because no analysis of the results is found within Plaintiff's medical record.

On June 6, 1997, Plaintiff saw Dr. Gondwe for a follow-up visit. (Tr. 275). At that time, nurse's notes for that visit indicate that Plaintiff was still smoking one-half to one pack of cigarettes per day. (*Id.*). Dr. Gondwe reported that Plaintiff's vital signs were stable and that Plaintiff had no complaints at that time. (*Id.*). Dr. Gondwe pointed out that Plaintiff's main problem at that time was demodex folliculorum;[21] Plaintiff was provided with a therapeutic lotion and advised to change his bedding. (*Id.*). Later that day, after Plaintiff's appointment with Dr. Gondwe ended, Dr. Gondwe reported that Plaintiff's laboratory results indicated a need to change Plaintiff's Coumadin dose. (*Id.*). Plaintiff could not be reached by phone, however, so Dr. Gondwe discussed the situation with Samaritan Home Care.[22] (*Id.*).

On June 10, 1997, Plaintiff was seen by Dr. Harb for follow-up care. (Tr. 274). Plaintiff complained of some dyspnea on exertion, but denied chest pain, shortness of breath at rest, palpitations, or dizziness. (*Id.*). Dr. Harb indicated that Plaintiff was still smoking. (*Id.*). Dr. Harb again discussed with Plaintiff the importance of modifying his risk factors. (Tr. 274). Plaintiff was advised to follow-up with his primary care provider and to return to Dr. Harb for evaluation in a few months or earlier as needed. (*Id.*).

Dr. Gondwe saw Plaintiff again on June 30, 1997. (Tr. 273). According to Dr. Gondwe's notes, Plaintiff wanted to go back to work. (*Id.*). Dr. Gondwe indicated that Plaintiff's line of work as a garbage man would be inappropriate given Plaintiff's health concerns. Specifically, it was stated that "the cardiologist has spoken to [Plaintiff] and the

---

[21] A very common, universally distributed and usually nonpathogenic species of mite that inhabits the hair follicle and sebaceous glands of humans, commonly around the nose and scalp margins. STEDMAN'S MEDICAL DICTIONARY 454-455 (26th ed. 1995).

[22] Apparently, Samaritan Home Care was assisting with obtaining laboratory specimens from Plaintiff. However, there are no records before this court which indicate the nature or extent of medical care Plaintiff received from this home care agency.

cardiologist's opinion is that he should find a different line of work. I do tend to concur on that issue and [Plaintiff] has been informed." (*Id*.). Objectively, Dr. Gondwe reported no findings at that time. (*Id*.). Nurse's notes for this appointment reveal that Plaintiff was smoking one-half to three-fourths of a pack of cigarettes per day at that time. (*Id*.). Dr. Gondwe reported that Plaintiff should remain off work for another six weeks until re-evaluated, and advised that Plaintiff continue with his current medication dose. (*Id*.). Handwritten notes dated July 28, 1997 indicate that Plaintiff should still continue with the same dose of medication, but do not show whether Plaintiff was present for a visit with any practitioner. (Tr. 273).

Plaintiff was evaluated by Dr. Gondwe again on August 11, 1997. (Tr. 272). At that time, Plaintiff was in no acute distress, and only experienced occasional chest pain. (*Id*.). Nurse's notes for this appointment show that Plaintiff was smoking one-half to three-fourths of a pack of cigarettes per day at that time. (*Id*.). Again, Dr. Gondwe expressed his opinion that Plaintiff could not perform his work as a garbage collector because "that [would be] putting him in extreme danger." (*Id*.). Handwritten notes, dated September 22, 1997, show that Plaintiff was again seen for a follow-up visit, but cannot be fully deciphered. (*Id*.).

On November 5, 1997, Plaintiff was examined by V. Kuchipudi, M.D., at the Freeport Health Network on behalf of the Bureau of Disability Determination Services. (Tr. 316). Plaintiff's chief complaint at the time of examination was shortness of breath, but his examination revealed that he was in no acute distress. (Tr 316-317). Plaintiff denied chest pain, back pain, coughing, or wheezing. (Tr 316). The social history notes from this visit indicate that Plaintiff had been smoking one pack of cigarettes per day for the past fifteen years. (*Id*.). Dr. Kuchipudi's impression of Plaintiff indicated that Plaintiff suffered from coronary artery disease in the past, experienced shortness of breath on exertion, had a history of herniated disks but

13

presently had good range of movements in the lower back, was afflicted with hypertension, and was a smoker. (Tr. 317).

Plaintiff's medical record was reviewed on December 8, 1997, by V. Pilapil, M.D, to determine Plaintiff's Residual Functional Capacity ("RFC"). (Tr. 318). Based on all the evidence in Plaintiff's file, including clinical and laboratory findings, symptoms, observations, lay evidence, and reports of daily activities, Dr. Pilapil determined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks for a total of about six hours in an eight-hour work day, sit with normal breaks for a total of about six hours in an eight-hour work day, and push and/or pull on an unlimited basis – including the operation of hand and/or foot controls. Dr. Pilapil indicated that these exertional limitations were appropriate for Plaintiff because of his history of coronary artery disease, deep venous thrombosis, pulmonary embolism, herniated disks, high blood pressure, and obesity. (Tr. 319-320). Dr. Pilapil opined that Plaintiff could balance, stoop, kneel, crouch, or crawl frequently, and should only occasionally climb ramps or stairs, and never climb ladders, ropes, or scaffolds. (Tr. 320). No manipulative, visual, communicative, or environmental limitations were noted by Dr. Pilapil. (Tr. 321-322). Dr. Pilapil indicated that no treating or examining source statement regarding Plaintiff's physical capacities was found within Plaintiff's file at that time. (Tr. 324).

Plaintiff sought care from Dr. Gondwe again on January 9, 1998. (Tr. 270). At that time, Dr. Gondwe reported that Plaintiff suffered from sinusitis, and noted that Plaintiff's history of coronary artery disease, deep venous thrombosis with pulmonary embolism, and hypertension. (*Id.*). Dr. Gondwe continued Plaintiff on his previously-prescribed medication regimen, and advised Plaintiff to lose weight. (*Id.*). Plaintiff told Dr. Gondwe that he couldn't lose weight

because cold weather kept him from exercising; Dr. Gondwe responded in Plaintiff's medical record by stating that "much of [Plaintiff's] lifestyle has been secondary to a driving occupation in the past, and [Plaintiff] has very poor motivational skills. At this point, [Plaintiff] has no desire to be involved in exercise." (*Id.*). Dr. Gondwe instructed Plaintiff to schedule a follow-up visit in six months. (*Id.*).

A second physical RFC assessment for Plaintiff was completed by Y. Kim, M.D., on March 5, 1998. (Tr. 326). After reviewing all the evidence in Plaintiff's medical record, Dr. Kim concluded that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand or walk with normal breaks for about six hours in an eight-hour workday, sit with normal breaks for six hours in an eight-hour workday, and push or pull for unlimited periods of time with the lift and carry weight limitations. (Tr. 327). With regard to postural limitations, Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but should not climb ladders, ropes, or scaffolds. (Tr. 328). Dr. Kim determined Plaintiff did not have manipulative, visual, communicative, or environmental limitations at that time. (Tr. 329-330).

On April 15, 1998, Dr. Gondwe evaluated Plaintiff again. (Tr. 339). At that time, Plaintiff denied any chest pain and shortness of breath without exertion. (*Id.*). Plaintiff was experiencing shortness of breath with moderate exertion. (*Id.*). Dr. Gondwe's notes reveal that he spoke with Plaintiff "at length" about continuing his medication regimen. (*Id.*). One month later, Plaintiff failed to show for or cancel an appointment scheduled with Dr. Harb. (*Id.*).

On September 10, 1998, Plaintiff saw Dr. Harb again. (Tr. 338). Dr. Harb diagnosed Plaintiff with coronary artery disease, lateral wall myocardial infarction, non-compliance, pulmonary embolism, morbid obesity, hyperlipidemia, nicotine addiction, and congestive heart

failure. (*Id.*). Dr. Harb noted that Plaintiff appeared healthy, had clear lungs, and needed to discontinue smoking. (*Id.*).

Plaintiff's next medical record is for an appointment with Dr. Gondwe on March 17, 1999. (Tr. 336). Dr. Gondwe's dictation at that time indicates that Plaintiff has not been seen for evaluations "since April of 1998, despite having been scheduled for return visits." (*Id.*). Plaintiff had "no particular complaints at this time," denied angina, and was not taking his medications. (*Id.*). Plaintiff told Dr. Gondwe he quit taking his medications because he was unable to afford them. (*Id.*). Plaintiff was in no acute distress, demonstrated no adenopathy, had clear lungs, normal musculoskeletal presentation, normal extremities, normal integument, and good cognitive function at that time. (*Id.*). Plaintiff appeared, however, to have chronic obstructive pulmonary disease "from years of smoking." (*Id.*).

Dr. Rasheed evaluated Plaintiff again on May 18, 1999. (Tr. 437). At that time, Plaintiff was "well-developed, well-nourished, and appear[ed] to be in no distress." (*Id.*). Plaintiff was experiencing "no anxiety or depression." (*Id.*). Nursing notes for this appointment indicate that Plaintiff was smoking 10-15 cigarettes per day and rarely using alcohol. (Tr. 438). Dr. Rasheed noted that Plaintiff was not taking his anticoagulant medication, and advised Plaintiff to continue with his medications as directed. (Tr. 437). Because Plaintiff complained of some chest discomfort at that time, Dr. Rasheed instructed Plaintiff to seek further medical care if the discomfort persisted. (*Id.*). Dr. Rasheed further instructed Plaintiff to return in ten months, and follow with his primary care physician as needed "in the meantime." (*Id.*).

A Cardiac RFC Questionnaire was completed by Dr. Gondwe on May 26, 1999.[23] (Tr. 345). The first question of this form asks about the nature, frequency, and length of contact the answering physician has with the Plaintiff; Dr. Gondwe responded that he was familiar with Plaintiff because of interactions at the clinic and hospital, but that visits were "infrequent" because of missed appointments and lack of follow-up. (*Id.*). Dr. Gondwe indicated that Plaintiff's symptoms included chest pain, shortness of breath, fatigue, edema, and palpitations. (*Id.*). Dr. Gondwe did not indicate that Plaintiff had anginal equivalent pain when asked to identify Plaintiff's symptoms, but answered the next question – about the frequency, nature, location, radiation, precipitating factors, and severity of anginal pain – by stating that Plaintiff experienced angina two to three days each week, of varying severity. (*Id.*). Dr. Gondwe reported that Plaintiff was not a "malingerer," and had a "marked limitation of physical activity," but was "unsure" about the "role of stress" with regard to Plaintiff's symptoms. (Tr. 346). Dr. Gondwe indicated that Plaintiff was incapable of "low stress" jobs because of pain and dyspnea at rest. (*Id.*). Dr. Gondwe also noted that Plaintiff may "possibly" experience emotional difficulties, and added that "anyone living with a chronic, potentially-fatal ailment is bound to have psychological effects or depression or anxiety." (*Id.*). When asked if emotional factors contributed to the severity of Plaintiff's subjective symptoms and functional limitations, Dr. Gondwe answered, "no." (*Id.*). According to Dr. Gondwe, Plaintiff could sit for about four hours during an eight-hour work day, may need a job which permits shifting positions at will from sitting, standing or walking depending on the job description, should elevate his legs if sitting for prolonged periods of time, could occasionally lift ten pounds, and could frequently lift less than ten pounds. (Tr. 348). Dr. Gondwe also indicated that Plaintiff should avoid

---

[23] It is unclear why Plaintiff's primary care practitioner completed this form instead of one of his cardiologists.

concentrated exposure to extreme cold or heat, high humidity, fumes/odors/dusts/gases, soldering fluxes, solvents/cleaners, and chemicals; no restrictions were placed on Plaintiff's exposure to perfumes or cigarette smoke. (Tr. 349).

On September 2, 1999, David E. Hanson, M.D., completed a Cardiac Report about Plaintiff's cardiac condition.[24] (Tr. 352). This report initially states that Plaintiff was seen most recently on August 9, 1999, though no record is found within Plaintiff's medical record to verify that statement. Dr. Hanson reported that Plaintiff may have had end organ damage as a result of hypertension, because Plaintiff's "myocardial infarction may have been caused in part by hypertension." (Id.). Dr. Hanson noted that Plaintiff did not have congenital heart disease, arrhythmia due to cardiac disease, neurological complications as a result of cardiovascular disease, or discomfort from ischemic heart disease. (Tr. 352-353). Dr. Hanson indicated that Plaintiff suffered from recurrent or persistent fatigue and dyspnea at rest, and experienced fatigue and dyspnea with ordinary physical activity. (Tr. 353). When asked if restrictions had been placed on Plaintiff's ability to engage in physical activity, Dr. Hanson indicated that Plaintiff was unable to walk one block, and had dyspnea with his activities of daily living. (Id.). Dr. Hanson further noted that Plaintiff lived with his mother who performed all household duties, while Plaintiff was unable to perform activities of daily living and spent his time "largely watching TV." (Tr. 354).

Also on September 2, 1999, Dr. Hanson completed a Diabetic Report on behalf of Plaintiff. (Tr. 356). This report indicates that Plaintiff was diagnosed with diabetes mellitus on

---

[24] It is unclear why a practitioner who had not previously evaluated Plaintiff completed this form instead of one of Plaintiff's cardiologists.

May 14, 1999.[25] (*Id.*). Per Dr. Hanson, Plaintiff's compliance with therapy was good, and Plaintiff had no vascular complications as a result of his diabetic condition. (*Id.*).

To round out his reports about Plaintiff, Dr. Hanson also completed a Psychiatric Report for Plaintiff on September 2, 1999. (Tr. 357). In this report, Dr. Hanson indicates that Plaintiff is

> able to care for [him]self. [Plaintiff] can clean house, but [is] unable to do yard work. [Plaintiff] lives with [his] mother who does support and bill payments. [Plaintiff is] able to drive. ... [Plaintiff] watches TV or takes drives. [Plaintiff] can walk short distances [less than] one block."

(*Id.*). With regard to Plaintiff's mental status, Dr. Hanson noted that Plaintiff operated within normal limits, and had appropriate judgment. (Tr. 358-359). Dr. Hanson did not provide any further remarks about Plaintiff's impairments or conditions, and indicated that Plaintiff was able to perform work-related activities such as understanding, carrying out and remembering instructions, and could respond appropriately to supervision, co-workers, and customary work pressures. (Tr. 359). Plaintiff was limited only to the extent that he was "unable to lift, carry, climb, or ambulate long distances." (*Id.*).

Plaintiff underwent a one-hour Psychiatric Evaluation by D. V. Domingo, M.D., on September 27, 1999. (Tr. 360-362). At that time, Plaintiff was experiencing chest pains "on and off." (Tr. 360). Plaintiff reported to Dr. Domingo that he longed to work, but that his doctors would not "release him." (Tr. 361). Plaintiff presented to Dr. Domingo with a normal gait, appropriate affect, good attitude, and was cooperative and coherent. (*Id.*). Dr. Domingo's diagnosis of Plaintiff was that Plaintiff had a history of: (1) coronary heart disease, (2) diabetes mellitus, type II, (3) disc disease of the lower back, (4) hypertension, (5) high cholesterol level,

---

[25] There are no records before this court indicating that Plaintiff was evaluated by a practitioner or diagnosed with diabetes mellitus on this date.

(6) bronchial asthma, and (7) pulmonary embolism. (Tr. 361-362). According to Dr. Domingo, Plaintiff is capable of managing benefits in his interest. (Tr. 362).

Plaintiff was next seen on November 5, 1999, by A. Taja, M.D. (Tr. 435). Plaintiff was experiencing hematochezia[26] and gastroesophageal[27] reflux at that time. (*Id.*). The record for this visit indicates that Plaintiff was smoking half of a pack of cigarettes per day, down from more heavy smoking of three packs per day in the recent past. (*Id.*). Dr. Taja's impression was that Plaintiff had a chronic history of gastroesophageal reflux disease, and had a history of lower gastrointestinal bleed. (*Id.*). Dr. Taja provided samples of medication and ordered tests as he deemed appropriate. (*Id.*).

On November 10, 1999, Plaintiff was evaluated by Kamlesh Ramchandani, M.D. (Tr. 373). At that time, Plaintiff denied any nausea, vomiting, shortness of breath, dizziness, or sweating. (*Id.*). Just five days after Plaintiff reported to Dr. Taja that he smoked half of a pack of cigarettes per day, Plaintiff told Dr. Ramchandani that he "quit smoking one month back; used to smoke one pack a day for twenty years." (*Id.*). Dr. Ramchandani indicated that his exam revealed

> an obese male in no acute physical distress. Vital signs are stable. ... His gait is slow and measured. He is able to walk on the heels and toes gingerly. He is able to squat partially and get up from partially squatting position with support. He is able to get on and off the examination table with assistance. He is able to dress and undress himself without assistance. He is right handed. His grip is 5/5 bilaterally. Able to pick up objects, open and close the door, oppose the thumb to fingers, make a fist, flip pages.

---

[26] Passage of bloody stools, in contradistinction to melena, or tarry stools. STEDMAN'S MEDICAL DICTIONARY 771 (26th ed. 1995).

[27] Relating to both stomach and esophagus. STEDMAN'S MEDICAL DICTIONARY 709 (26th ed. 1995).

20

(Tr. 374). Dr. Ramchandani's impression was that Plaintiff had coronary artery disease with stable anginal chest pains, lumbar arthralgia, a history of hypertension and noninsulin dependent diabetes, and had dyspnea. (*Id.*).

On November 16 and November 29, 1999, Plaintiff followed up with Dr. Taja for evaluation and treatment of his gastrointestinal concerns. (Tr. 440, 434). With medication, Plaintiff was asymptomatic by the time Dr. Taja saw him on November 29, 1999. (Tr. 434). Dr. Taja decided to continue Plaintiff on medication and instructed Plaintiff to eat a high fiber diet to minimize his gastrointestinal problems. (*Id.*).

On January 14, 2000, a third RFC was completed based on Plaintiff's medical record. (Tr. 389). Dr. Kim, who also completed Plaintiff's second RFC, determined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand or walk with normal breaks for about six hours in an eight-hour workday, sit with normal breaks for six hours in an eight-hour workday, and push or pull for unlimited periods of time with the lift and carry weight limitations. (Tr. 390). With regard to postural limitations, Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but should not climb ladders, ropes, or scaffolds. (Tr. 391). Dr. Kim determined that Plaintiff did not have manipulative, visual, or communicative limitations at that time, but should avoid concentrated exposure to fumes, odors, gases, poor ventilation, or hazards such as machinery and heights. (Tr. 391-392). In this RFC, Dr. Kim commented that

> [Plaintiff's] gait is slow and measured because of his obesity. His ability to move and do daily activities would be limited because of his obesity. His breathing was reduced but not significantly. Therefore, the [Plaintiff] should be able to perform medium work with some postural limitations and also some environmental limitations. His coronary artery disease was stable. . . .

(*Id.*).

Plaintiff's next contact with medical practitioners was with Dr. Taja, on February 28, 2000. (Tr. 433). Plaintiff did not complain of heartburn or discomfort at that time. (*Id.*). Dr. Taja determined that Plaintiff had Barrett's esophagus, reflux which was controlled with medication, and was obese. (*Id.*). Dr. Taja "rediscussed with [Plaintiff] the importance of losing weight for management of [gastroesophageal reflux disease] and [coronary artery disease,]" and instructed Plaintiff to return in three months for further evaluation. (*Id.*).

On March 1, 2000, Plaintiff followed up with Dr. Rasheed again. (Tr. 419)[28]. Plaintiff was in no distress at that time, and demonstrated no anxiety or depression. (*Id.*). Dr. Rasheed noted that Plaintiff was exhibiting normal respiratory efforts, and that Plaintiff's lungs were clear to percussion and auscultation. (*Id.*). Dr. Rasheed made minor changes to Plaintiff's medication regimen, and ordered an electrocardiogram and a stress test to assess Plaintiff's angina. (*Id.*). Dr. Rasheed deferred recommending any other treatments or therapies pending the outcome of Plaintiff's electrocardiogram and stress test results. (*Id.*). Plaintiff's echocardiogram showed Plaintiff to have probable mild left ventricular hypertrophy and decreased left ventricular systolic function. (Tr. 450). Plaintiff's stress test was aborted after just three minutes and twelve seconds because of exercise intolerance. (Tr. 451). Dr. Rasheed determined that Plaintiff had an abnormal stress test due to exercise-induced chest pain at a low level of stress. (*Id.*). Dr. Rasheed ordered cardiac catheterization because Plaintiff's stress test was abnormal. (Tr. 429). After Plaintiff's cardiac catheterization was completed on March 31, 2000, Dr. Rasheed concluded that Plaintiff's left ventricular systolic function was moderately decreased. (Tr. 449). Additionally, Dr. Rasheed noted that Plaintiff did not have any significant stenosis except for his

---

[28] A duplicate report of this visit can be found on pages 431-432 of the record.

chronically occluded LAD. (*Id.*). Dr. Rasheed recommended treating Plaintiff medically for ischemic heart disease. (*Id.*).

On April 4, 2000, Plaintiff did not call or show for his follow-up appointment with Dr. Rasheed. (Tr. 429). Dr. Rasheed's staff sent a letter to Plaintiff to reschedule the appointment. (*Id.*).

Dr. Rasheed finally saw Plaintiff for a follow-up examination on May 1, 2000. (Tr. 428). Plaintiff was not taking his Coumadin at that time, apparently because he was planning to have dental work done. (*Id.*). Plaintiff denied chest pain at that time, but was experiencing a cough and shortness of breath on exertion; Dr. Rasheed noted that Plaintiff was in no distress. (*Id.*). Dr. Rasheed's impression was that Plaintiff was "stable from a cardiac standpoint." (Tr. 427). Dr. Rasheed discussed "risk reduction measures" with Plaintiff again, and advised Plaintiff to return for another examination in one year. (*Id.*).

On June 1, 2000, Plaintiff returned to Dr. Taja for evaluation of his gastroesophageal reflux disease. (Tr. 426). Per Dr. Taja, Plaintiff was "doing fine with no gastroesophageal reflux symptoms at all." (*Id.*). Dr. Taja reported that Plaintiff had not lost weight, should continue taking medications as directed, and should return for a repeat endoscopy in November of 2000. (*Id.*).

Dr. Hanson authored a letter to Plaintiff's attorney on September 20, 2000, which is included in Plaintiff's medical record. (Tr. 417). Dr. Hanson indicated that Plaintiff's "physical condition precludes any gainful employment whatsoever" because Plaintiff "becomes markedly winded when climbing one flight of stairs and has neither the training [nor the] physical condition to work even an office job. His daily activity consists mainly of watching television."

Dr. Hanson relays Plaintiff's story that he was found not disabled because of "the combined income of Plaintiff's brother, sister, and mother." (Id.).

Dr. Rasheed conducted a Pre-operative Cardiac Assessment[29] of Plaintiff on October 9, 2000. (Tr. 424). Plaintiff had no symptoms of anxiety or depression, normal respiratory efforts, clear lungs, regular heart sounds, and normal gait. (Id.). Plaintiff was noted to have a mild increased risk for perioperative[30] cardiac complications, but was cleared for his operation. (Id.).

On November 3, 2000, Dr. Taja evaluated Plaintiff again for his gastroesophageal reflux. (Tr. 423). Plaintiff was complaining of only infrequent heartburn at that time; Dr. Taja noted that Plaintiff still had not lost weight as instructed. (Id.). Dr. Taja planned to repeat an upper endoscopy and collect esophageal biopsies for evaluation of Plaintiff's esophageal problems. (Id.).

Plaintiff underwent an esophagogastroduodenoscopy[31] with biopsies on November 10, 2000. (Tr. 439). Dr. Taja evaluated the results of these procedures, and recommended that Plaintiff continue with his medication regimen as previously prescribed, follow standard anti-reflux measures, and return to the gastrointestinal clinic with further concerns. (Id.). Plaintiff followed up with Dr. Taja on November 20, 2000, and was "doing fine" at that time. Dr. Taja examined Plaintiff and found him to be "not in acute distress, comfortable." (Id.). Because Plaintiff experienced a day's worth of loose bowel movements, he was advised to increase his

---

[29] It is unclear from the assessment what type of operation Plaintiff was to have.

[30] Around the time of operation. STEDMAN'S MEDICAL DICTIONARY 1331 (26th ed. 1995).

[31] Endoscopic examination of the esophagus, stomach and duodenum usually performed using a fiberoptic instrument. STEDMAN'S MEDICAL DICTIONARY 598 (26th ed. 1995).

24

fluid intake, utilize over-the-counter anti-diarrheal agents, and return to the gastrointestinal clinic if his problems continued beyond two additional days. (*Id.*).

Dr. Hanson returned to the scene on February 1, 2001, to complete a second Cardiac RFC Questionnaire for Plaintiff. (Tr. 397). Dr. Hanson indicated that Plaintiff suffered from anginal equivalent pain, shortness of breath, fatigue, and weakness. (*Id.*). Dr. Hanson noted that Plaintiff was not a "malingerer" and had a marked limitation of physical activity. (Tr. 398). According to Dr. Hanson, "physical stress brings on [Plaintiff's] symptoms." Dr. Hanson reported that Plaintiff was capable of low stress jobs, did not experience emotional difficulties such as depression or anxiety as a result of his symptoms, and stated that Plaintiff's subjective symptoms and functional limitations were not affected by Plaintiffs emotional factors. (*Id.*). Further, Dr. Hanson noted that Plaintiff's cardiac symptoms seldom interfere with attention and concentration. (*Id.*). With regard to environmental restrictions, Dr. Hanson indicated that Plaintiff should avoid concentrated exposure to high humidity, fumes, odors, dusts, gases, soldering fluxes, solvents and cleaners; Plaintiff should also avoid all exposure to extreme cold, extreme heat, and cigarette smoke. (Tr. 400).

Dr. Hanson also completed a Diabetes Mellitus RFC Questionnaire on February 1, 2001. (Tr. 402). On this form, Dr. Hanson indicated that Plaintiff's symptoms included fatigue, general malaise, extremity pain and numbness, difficulty walking, and rapid heart beat/chest pain. (*Id.*). Plaintiff's symptoms associated with diabetes were seldom severe enough to interfere with Plaintiff's attention and concentration, and again, Dr. Hanson indicated that Plaintiff was capable of low stress jobs without significant physical exertion. (Tr. 403). Dr. Hanson reported that Plaintiff could sit at one time for 30 minutes, stand at one time for 10 minutes, and could sit for a total of at least six hours and stand/walk for less than two hours in an

eight-hour working day. (*Id.*). Dr. Hanson estimated that Plaintiff would require a job which allowed shifting from sitting, standing, and walking, and could not determine how often Plaintiff would need to take unscheduled breaks during an eight-hour working day. (Tr. 404). Dr. Hanson indicated that Plaintiff should rarely lift ten pounds, and should never lift twenty or fifty pounds; Plaintiff did not have significant limitations in reaching, handling or fingering; Plaintiff should avoid all exposure to extreme heat or cold and cigarette smoke, should avoid even moderate exposure to high humidity, and should avoid concentrated exposure to fumes, odors, dusts, and gases. (Tr. 404-405). Dr. Hanson commented that Plaintiff's heart disease and cardiomyopathy were Plaintiff's most significant limiting factors with regard to his ability to work at a regular job on a sustained basis. (Tr. 405).

On April 6, 2001, Dr. Hanson penned another letter to Plaintiff's attorney, which is incorporated into Plaintiff's medical record. (Tr. 452). This letter indicates that Plaintiff is "nominally independent in activities of daily living" with "his mother continu[ing] to do much of the heavy work around the house including doing laundry and preparing meals." (*Id.*). Dr. Hanson opined that Plaintiff

> would be unable to pursue any meaningful employment in the private sector. Because of his sedentary condition, I do not believe that he would be able to work even in a sheltered workshop. ... I do not anticipate that given [Plaintiff's] multiple co-morbidities that he would ever be capable of competitive employment in any capacity whatsoever.

(Tr. 453).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, re-weigh the evidence

26

or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citations omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *also see Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimum articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of a witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have

greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V. **FRAMEWORK FOR DECISION**

The Commissioner has established a sequential five-step process to evaluate disability claims. 20 C.F.R. § 404.1520 (2003). If disability or lack of disability is determined at any step in the process, the evaluation ends. 20 C.F.R. § 404.1520(a). The Commissioner begins by asking whether a claimant is presently engaged in employment that qualifies as substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(b). If the answer is yes, the claimant is deemed not disabled. *Id.* If the answer is no, the Commissioner next asks whether the claimant has any impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the answer is no, the claimant is found to be not disabled. *Id.* If the answer is yes, the Commissioner then determines whether the claimant's impairments meets or equals a listed impairment. 20 C.F.R. § 404.1520(d). If the answer is yes, the Commissioner will find that the claimant is disabled. *Id.* If the answer is no, the Commissioner then inquires whether the claimant's impairments prevent him from doing past relevant work. 20 C.F.R. § 404.1520(e). If the answer is no, the claimant is not disabled. *Id.* If the answer is yes, the Commission finally asks whether the claimant's impairments prevent him from doing any other work. 20 C.F.R. § 404.1520(f). If the answer is yes, a determination of disability is made. If the answer is no, the claimant is determined not to be disabled. *Id.* Plaintiff bears the burden proof in steps one through four. *Young v. Sec'y of Health & Human Services*, 957 F.2d 386, 389 (1992). At step five, the burden shifts to the Commissioner. *Id.*

## VI. ANALYSIS

The court will proceed through the five step analysis in order.

### A. Step One: Is the claimant currently engaged in substantial gainful activity?

The ALJ found no evidence of work after the Plaintiff's application date. (Tr. 27). Neither party disputes this first determination by the ALJ, and there is substantial evidence to support the determination of the ALJ.

### B. Step Two: Does the claimant suffer from a severe impairment?

The ALJ then considered whether Plaintiff suffered from a severe impairment. (Tr. 27). A severe impairment exists where an impairment or combination of impairments significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The ALJ determined that Plaintiff possessed a severe impairment. (*Id.*). Specifically, the ALJ determined Plaintiff suffers from, among other things, coronary artery disease, obesity, diabetes, and back pain. (Tr. 32). Neither party challenges this second determination, and there is substantial evidence to support the determination of the ALJ.

### C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

The ALJ next determined whether the Plaintiff's condition met the requirements or equaled the level of severity contemplated for any impairment listed in Appendix 1 to Subpart P, Regulations No. 4. (Tr. 27). The ALJ determined that Plaintiff's condition did not satisfy the criteria under sections 4.03, 3.02, or 1.05C. The ALJ stated:

> For example, although [Plaintiff] has hypertension and cardiac difficulties, it is not accompanied by significant end organ damage or other abnormalities as required to satisfy the criteria under section 4.03 of the Listing. Likewise, the record does not reflect any pulmonary function studies with results equivalent to that required under the tables associated with Section 3.02. Further, [Plaintiff's]

back impairment is not accompanied by the neurological deficits required by section 1.05C, nor does the record contain other findings of equivalent severity.

(*Id.*). This thorough analysis by the ALJ allows the court to follow the ALJ's reasoning and proceed without question to the next step of the disability determination process. Substantial evidence exists to support the ALJ's determination at this step, and the court finds no reason to disturb it.

## D. Step Four: Is the claimant capable of performing work which the claimant performed in the past?

Before reaching the step-four analysis, the ALJ established Plaintiff's RFC. (Tr. 27). The RFC is what the Plaintiff can still do despite his limitations. See 20 C.F.R. §416.945. The ALJ considered Plaintiff's allegations of disabling symptoms and limitations and the entire record. (*Id.*). The ALJ determined that

> Plaintiff's medically determinable impairments preclude the following work-related activities: lifting more than 20 pounds occasionally or more than 10 pounds frequently; standing and/or walking for more than a total of 6 hours in an eight-hour workday; climbing ropes, ladders, or scaffolds; bending, stooping, crouching, kneeling, crawling or balancing more than occasionally; climbing (ascending) stairs more than occasionally; [] performing work around unprotected heights or with or near dangerous moving machinery; concentrated exposure to environments containing dust, odors, gases or fumes; and concentrated exposure to temperature extremes.

(Tr. 17). The ALJ determined that Plaintiff's medical records "fail[ed] to provide strong support for the [Plaintiff's] allegations of disabling symptoms and limitations.." (Tr. 28). Further, the ALJ determined that Plaintiff's "condition is controlled by medication and does not further reduce the residual functional capacity given to [Plaintiff] in this decision." (*Id.*). The ALJ went on to state that "the description of the symptoms and limitations, which [Plaintiff] has provided throughout the record [have] generally been inconsistent and unpersuasive." (*Id.*). To determine this RFC, the ALJ considered Plaintiff's entire medical record, including the three RFC's in

Plaintiff's medical record, numerous cardiac, diabetes, and psychiatric RFC questionnaires, and subjective and objective data in Plaintiff's medical record. (Tr. 30). The ALJ specifically noted:

> The stress test that [Plaintiff] could not complete because of his low tolerance for exercise was used by the Disability Determination Services to determine [Plaintiff] could still do work at the medium level. Although this determination was not adopted in this decision, it supports the reduced residual functional capacity assessment given to [Plaintiff] by the undersigned."

(*Id.*).

The ALJ then performed the step-four analysis to determine whether Plaintiff's severe impairments prevented Plaintiff from engaging in past relevant work. (Tr. 31). Past relevant work is SGA that the Plaintiff performed within the previous fifteen years and that the Plaintiff performed for a period of time sufficient to learn how to do the work. 20 C.F.R. §§ 404.1520(e), 404.1560(b)(1). The ALJ determined that Plaintiff could not "perform any past relevant work, since even the [Plaintiff's] least demanding past relevant job as a city laborer required him to lift items weighing over 100 pounds on occasion. This work activity is inconsistent with the [RFC] determined above." (*Id.*).

The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding.

## E.  Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five, the ALJ determined that although Plaintiff's RFC did not allow him to perform his past relevant work, Plaintiff can perform a "limited range of light work." (Tr. 31). To make his determination, the ALJ consulted vocational expert James Radke, who determined that Plaintiff could still perform light work such as packaging/order-filling, miscellaneous food preparation, and cashier, and assembler occupations. (*Id.*). According to the ALJ, and

in view of the claimant's vocational characteristics and the [RFC] reported above, Medical-Vocational rule 202.20 serves as a framework for decision-making. Although [Plaintiff's] limitations prevent the performance of the full range of light work, there are still a significant number of jobs that [Plaintiff] can perform. The undersigned's opinion is confirmed by the vocational expert, who testified that an individual with [Plaintiff's] vocational characteristics and residual functional capacity would be able to perform jobs existing in significant numbers in the economy.

(*Id.*). There were 12,800 packaging/order filling positions, 12,600 miscellaneous food prep position, 24,300 cashier positions, and 32,900 assembler positions at the light level available in the eleven-county Northern Illinois area. (Tr. 76).

After reviewing Plaintiff's medical record and the ALJ's opinion, this court finds substantial evidence to support the ALJ. As the ALJ pointed out in her opinion, Plaintiff's medical records "fail to provide strong support for the [Plaintiff's] allegations of disabling symptoms and limitations.." (Tr. 28).

Plaintiff asserts that it is unclear what RFC evaluations the ALJ relies on in her opinion. The RFC evaluations are clearly referenced in the ALJ's opinion. Plaintiff's record includes: three RFC Assessments (completed by non-treating physicians who examined Plaintiff's medical record) (Tr. 318, 326, 389); two Cardiac RFC Questionnaires, completed by Dr. Gondwe (Tr. 345) and Dr. Hanson (Tr. 397); a Cardiac Report (Tr. 352), Diabetic Report (Tr. 356), and Psychiatry Report (Tr. 357) completed by Dr. Hanson; and a Diabetes Mellitus RFC Questionnaire completed by Dr. Hanson (Tr. 402). The ALJ referenced the reports appropriately by exhibit number throughout her opinion. The RFC established by the ALJ is substantially supported by Plaintiff's most recent medical records and RFC assessments, reports, and questionnaires.

The conflicts in Plaintiff's medical records arise in the questionnaire forms and letters completed and submitted by Dr. Hanson (Tr. 352, 356, 357, 397, 402, 417, 452). Dr. Hanson's questionnaires and letters – including the letter submitted after Plaintiff's hearing – are acknowledged by the ALJ. Dr. Hanson reported on September 20, 2000, that denying benefits to Plaintiff "would be to sentence him to certain death." (Tr. 417). It is unclear to this court, as it was to the ALJ, how Dr. Hanson arrived at this conclusion. No medical records indicate that Plaintiff was treated or evaluated by Dr. Hanson for the conditions or impairments Plaintiff suffers from. No other treating practitioners indicate in Plaintiff's medical records that he is disabled. After proclaiming work to be a death sentence for Plaintiff, Dr. Hanson completed a Cardiac RFC Questionnaire on February 1, 2001, which stated that Plaintiff was "capable of low stress jobs." (Tr. 398). Further, Dr. Gondwe stated that "the cardiologist has spoken to [Plaintiff] and the cardiologist's opinion is that he should find a different line of work. I do tend to concur on that issue and [Plaintiff] has been informed." (Tr. 273). While it is true that Dr. Gondwe made this statement in 1997, three and four years before Dr. Hanson's letters were written, Dr. Gondwe did not make any statements indicating his opinion about how Plaintiff had changed during those three years. Accordingly, because substantial evidence exists to support the ALJ's finding, this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII. CONCLUSION

For the above-stated reasons, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Judgment on the Administrative Record and Pleadings is denied; Defendant's Motion for Summary Judgment is granted.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 8/6/04